GLICKSTEIN, Judge,
dissenting.
This is an unhappy twist on Dickens’ Christmas Carol. As in Dickens’ story, the worst victims are innocent children. Unlike Dickens’ story, this one has a perverse, insensitive, harsh ending.
The protagonist is Dr. Gardner, a cardiovascular surgeon in West Palm Beach in a group of thirty physicians of varying specialties. He is the father of two talented children, a boy who was 16 and a girl, 14, when the trial court heard the matter. The doctor’s gross income in 1982 was $205,000, when he and his wife of eighteen years entered into a written support agreement, and may have been less in 1983 when their marriage was dissolved. By the terms of his 1982 agreement, the doctor was to pay $1,000 per month for each child’s support, as well as one-half of the expenses of their college education. The children and their mother moved to New York in 1982.
As I read the uncontradicted facts in the record, Gardner, like a good many financially successful men, looked after the children’s financial security but failed to provide them with emotional security. As in many cases, he provided a building, not a home, in which building the strongest walls were the ones he built around himself to keep out his children, thus depriving them of the caring that every child needs and wants. As a result, the children were finally seen by a clinical psychologist, Dr. Cooley, in 1981 and 1982, who testified in 1984, when this parade of horrors for the children and their-mother was in full gallop, that the children’s unfulfilled expectations vis-a-vis their father caused them to feel guilty; that the son, Erik, really had a strong desire to have a relationship with his father and had attempted to be open in giving and receiving, but that he continued to experience disappointments. The quality of time together, on occasion, was not what Erik had hoped it would be, and he did not want to expose himself to any more disappointments or hurt. The emotional effect on him was “real tough at times.” Dr. Cooley further testified:
Erik is the type of person who tends to hold things in until it’s too late, and then he kind’ve [sic] explodes emotionally.

... he is feeling comfortable now, because it creates such disappointment and pain, that he chooses not to reach out, open himself up again.
As for Erik’s younger sister, Shana, Dr. Cooley testified:
I always saw Shana a little less from the very beginning.
Shana’s testimony revealed the following: What reasons have you or do you have for not wanting to see your father, as you’ve told him you haven’t wanted to see him.
A. God... There are just so many reasons. Just so many things have happened over the past years, you know.
Like even before my parents separated, it’s like he was really never there. You know. Like he lived with us and he would come home sometimes — I mean he would come home at night. But Erik and I hardly ever saw him because he would come — I don’t know how late — but he’d come home after we had gone to bed and then he’d be gone before we got up in the morning. And occasionally we’d see him on weekends, you know.
But he’s always been out dictating, you know, sitting in the sun or whatever. And we had two boats and we went out on them occasionally, but a lot of times our trips got cancelled and everything.
And then once he did move out, it wasn’t like it was that much of a change. You know, it’s like he moved out and his clothes were gone and everything, but I mean it wasn’t that much different, you know. And then once he left, we saw him about the same as we saw him when he lived with us. We hardly ever saw him at all. And then when we did, he would, like, call us up on Friday night and want us over for Sunday afternoon, and usually we had plans by then. So we hardly ever saw him.
Then just a whole bunch of other things have happened. Like I think it *409 was two summers ago, he came out to Colorado to visit us—
MR. ISRAEL: Objection, Your Honor. Again, we’re beyond the scope of the motion before the Court.
THE COURT: Overruled.
MR. HAINES: Go ahead, Shana.
THE COURT: Go ahead. You can answer the question.
THE WITNESS: Okay. But he came out and he came a day early — yeah, I think it was a day early. But he came practically unannounced.... We had some friends over, and he wanted to spend the night there and everything. I think he got pretty upset because my mother wouldn’t let him, where I really didn’t see that that was being too awful, you know. But once that scene was over, we had a pretty good vacation with him.
But then when we got home, we were a day late for school and I heard, like, just from my friends around town and stuff, that he had talked to different people and stuff and said—
MR. ISRAEL: Objection. Hearsay.
THE COURT: Sustained. You can’t answer that question. You’re going too far afield.
THE WITNESS: Okay.
[MR. HAINES:] It’s a rule that... Just — Do you know — I’m kind of following the Court’s line of questions here, but do you know that your mom agreed that you should see your father 85 days a year?
A. Yes.
Q. Do you have a problem with that?
A. Well, sort of. I mean I just don’t feel that’s right. I mean, I probably have the time to do it, but I just don’t feel that that’s right, because, I mean, I really don’t see how it’s between my parents how I should visit him. I think it should just be between my brother and I and my father and not between anybody else. And I think that’s one of my major objections.
Plus it’s just so hard for us to go see him, because if we have a nice time while we’re there, usually it happens that we leave and then, like, two or three weeks later, he’ll do something that’s just awful. Or we’re there and we had a bad time. I think that happens less. So it’s just a pattern, you know.

Q. Got to my point. The Judge asked a question of Erik that I’d like to ask you, because I have a feeling it’s going to be brought up.
Your mother agreed to 85 days minimum visitation a year. If the Judge ordered that this visitation occur 85 days a year, would you comply with it?
A. I really don’t know. I think that — I think that if it was going to emotionally hurt me, I don’t think I could.
Q. What do you mean emotionally hurt you?
A. Well, it’s just that we’ve had some pretty traumatic experiences with him and—
Q. Since October — Go ahead. I’m sorry.
A. And it’s just that, you know — I mean, it has to do with mental stability, so... I mean, I respect the law and everything, but I mean, I feel that there’s a point where it has to be stopped and you have to go on your own.
Q. Since October of last year, what kind of traumatic experience have you had with your father?
A. Well, this may sound kind of ridiculous, but I guess it’s hard for a teenager. Like when we went down for Thanksgiving, just — Like my birthday came, for one thing. And I realize that it wasn’t my stepmother’s fault or anything, but I mean, to get a misspelled birthday cake... you know.
Q. Do you think it was done intentionally?
A. I don’t know.
Having fairly described the helpless dilemma in which these two victimized children were placed by their father’s attendance to his professional and outside person *410 al life at their emotional expense, let’s now turn to the legal rack and screw on which the children were then placed.
First, the parties and their original counsel hammered out an agreement in 1982 without any apparent effective and meaningful consultation with the clinical psychologist or the children, as to Dr. Gardner having a minimum of 85 days in which to visit with his children. How do children living in New York realistically visit with a busy Florida cardiovascular surgeon? Do they visit between surgery at the hospital? Add to the medical scenario the fact that both children attended a professional children’s school because of their creative talents and gifts. I say “attended” rather than “attend” because of what the trial judge ultimately did by cutting off most of their child support, infra.
Second, from the time of the parties’ final judgment in October 1983, until the hearing of April 1984, that produced this appeal, there are no less than 69 docket entries to attest to the Gardner version of World War III. The parties filed almost every conceivable pleading imaginable, including Dr. Gardner’s attempts to have the trial judge removed. The number averages out to more than ten entries a month for six months. The children’s mother testified that she was required to return to Florida no less than four times in five months to fight the domestic versions of Guadalcanal, Iwo Jima, Truk and Bastogne. Yet, one would not only have been born at night but also last night to believe the children’s interests were highlighted. Money and property were the basic fights.
Third, the children were drawn into the war, without representation, and were denied due process. The initial pleading involving the children was filed in January 1984 by Dr. Gardner, who sought modification of his agreement by a change of their custody to him. We know from oral argument that at some point thereafter, the mother’s attorney asked the trial judge to appoint a guardian ad litem for the children. The father’s attorney objected. The trial judge denied the request. If he so acted because he did not know of any authority for same, I respectfully suggest such authority exists upon at least two bases. The first is Florida Rule of Civil Procedure 1.210(b) which provides:
(b) Infants or Incompetent Persons. When an infant or incompetent person has a representative, such as a guardian or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person. If an infant or incompetent person does not have a duly appointed representative, he may sue by his next friend or by a guardian ad litem. The court shall appoint a guardian ad litem for an infant or incompetent person not otherwise represented in an action or shall make such other order as it deems proper for the protection of the infant or incompetent person.
The second is the court’s inherent authority. See R. Horowitz and H. Davidson, Legal Rights of Children, § 6.09 (1984). Dr. Gardner then sought to have the mother put in jail because of non-compliance with a visitation order. The mother countered with a petition to reduce the father’s visitation because the children were recovering emotionally from the father’s historical lack of attention to their emotional needs and there was no justifiable reason to subject them to more hurt and disappointment.
At this point the question of due process arises, because on April 4, 1984, apparently without seeking an order allowing it, Dr. Gardner filed an amended petition for modification. For the first time he asked the trial court to eliminate all child support because (1) he was not getting his full rights of visitation; (2) the children do not wish visitation to occur; and (3) it would create no hardship on the children were support to be terminated. The trial court heard the amended petition on April 16, 1984; fourteen days after it was filed. There was no opportunity for response by the wife or children, much less notice to the children. Moreover, Florida Rule of Civil Procedure 1.440(a) expressly provides:
*411 (a)When at Issue. An action is at issue after any motions directed to the last pleading served have been disposed of or, if no such motions are served, 20 days after service of the last pleading. The party entitled to serve motions directed to the last pleading may waive the right to do so by filing a notice for trial at any time after the last pleading is served. The existence of cross-claims among the parties shall not prevent the court from setting the action for trial on the issues raised by the complaint, answer and any answer to a counter-claim.
Moreover, the rights of the children were subordinated on April 16,1984, by the hearing being conducted for the convenience of the attorneys on the issue of attorney’s fees. Again, the children were completely without representation and were put on the witness stand without any possible adult understanding of the significance of the hearing because of the newly injected issue.
Fourth, the trial court either failed to apply or misapplied the governing law; namely, that it had to consider:
(a) The advisability of visitation with the father by either or both children.[1] See Cortina v. Cortina, 108 So.2d 63 (Fla. 2d DCA 1958);
(b) The obligation of the father to prove what he had pled; namely, that the children would not suffer from the loss of support. See Clayton v. Clayton, 380 So.2d 1143 (Fla. 1st DCA 1980);
(c) The impropriety of granting relief not sought; namely, the termination of all college educational benefits. See Vance v. Vance, 274 So.2d 5 (Fla. 4th DCA 1973);
(d) The impropriety of granting modification without a material substantial change of circumstances. See § 61.16, Fla.Stat. (1983);
(e) The impropriety of not ruling upon the counter-petition that was in issue on April 16, 1984, ignoring for all legal and practical purposes the claims of the children.
As a result, the trial judge eliminated altogether the father’s obligation to pay for the children’s college education and reduced their child support from $1,000 per month to $300 per month each, saying:
It is, indeed, unfortunate that these young people, who are so eager and willing to accept the most generous, economic rewards and benefits from their father, fail to recognize their responsibilities and obligations to him, but are most content to “do their own thing.”
The jurisprudence of this state has dealt with this subject many times over and a total termination of all support of the children in this case would be detrimental to them. Certainly, under these circumstances they are no longer entitled to a degree of economic support provided them in the settlement agreement so long as their conduct and attitude remain unchanged.

In the event the children, or either of them, reconsider their position concerning compliance with the settlement agreement entered into by their mother and father concerning visitation privileges, and conduct themselves in accordance with it, the court will consider a petition for the restoration of the financial support to the children as provided in the settlement agreement.
I don’t know what has disturbed me the most about this case; the surprising content and tone of the final judgment; its effect upon two already confused and demoralized children;[2] the reference of the father’s lawyer to the children, before the trial judge, as spoiled brats; or the general attitude of everyone concerned with this case — parties, lawyers and judges — in keeping these children in the adversarial *412 process rather than utilizing modern mediation techniques,[3] without providing them representation or due process.
In any event, this case has been very painful to witness. How different from the regard for children reflected in John Denver’s song, Rhymes and Reasons:
So you speak to me of sadness and the coming of the winter.
The fear that is within you now it seems to never end.
And the dreams that have escaped you And the hope that you’ve forgotten;
you tell me that you need me now You want to be my friend.
And you wonder where we’re going; Where’s the rhyme; where’s the reason?
And it’s you cannot accept it’s here we must begin;
to seek the wisdom of the children And the graceful way of flowers in the wind.
For the children and the flowers are my sisters and my brothers.
Their laughter and their loveliness could clear a cloudy day.
Like the music of the mountains and the color of the rainbow They’re a promise of the future And the blessing for today.
Though the cities start to crumble, And the towers fall around us The sun is slowly fading And it’s colder than the sea.
It is written from the desert to the mountains “They shall lead us” By the hand and by the heart They will comfort you and me.
In their innocence and trusting They will teach us to be free.
And the song that I am singing Is a prayer to non-believers.
Come and stand beside me We can find a better way.

. They were not packaged as a pair of chicken breasts.

. My thoughts about child support are expressed in Vega v. Vega, 458 So.2d 416 (Fla. 4th DCA 1984). As for cutting off a child’s higher education, I can only quote Walt Disney’s profound observation that our greatest natural asset is the minds of our children.

. The state of the art in mediation can be found in Family Law Quarterly, Fall 1984, p. 363, and Family Law Quarterly, Winter, 1984, p. 451, et seq.